**COBB v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 11135.**

United States Court of Appeals
Sixth Circuit.

Dec. 4; 1950.

Briggs G. Simpich, Washington, D. C. (Briggs G. Simpich, Washington, D. C., on the brief), for petitioner.

S. Dee Hanson, Washington, D. C. (Theron Lamar Caudle, Ellis N. Slack, and S. Dee Hanson, all of Washington, D. C., on the brief), for respondent.

Before HICKS, Chief Judge, and SIMONS, and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

Once again we are confronted with the problem of the result, taxwise, in the creation of a family partnership. The diverse interpretations that have been given by courts to the rationale of Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670, need no longer trouble us in view of the illumination shed upon that case by the careful reasoning of the court in the later case of Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659. Moreover, there is now a broader review of the fact findings of the Tax Court by the test applied to such findings in the 1948 Judicial Code. § 36, Act of June 25, 1948, 26 U.S.C.A. § 1141(a). This test imposes upon us the duty of careful scrutiny of the record to determine whether or not such findings are clearly erroneous. This being so, consideration of cases decided before the effective date of the 1948. codification become of doubtful value in the consideration of the present problem, though we are, of course, bound by such findings, if they are supported by substantial evidence and there is reasonable basis in the record for them.

The Tax Court found that the petitioner had been engaged in manufacturing and repairing articles made of canvas since 1935 in partnership for some time with his brother; and after 1938 with both his brother and H. L. Carson. The brother died in 1941, and a new partnership was formed with Carson under the name of the Cobb Canvas Company. On November 30, 1945, Cobb purchased Carson's interest in the firm for $7,800 and a one-half interest in certain real estate. Cobb and his wife, Ida E. Cobb, at that time agreed with Carson to execute a mortgage on other real estate to indemnify Carson against any of the unpaid debts of the old partnership. The written agreement of dissolution re-

cited that the petitioner and Ida E. Cobb became copartners, would open an account in their own name, do business as the Cobb Canvas Company, and that all credit extended to it would be on the credit rating of the new company. Ida Cobb did not sign this agreement; it does not purport to be articles of partnership; and the court found that the Cobbs agreed to be partners in an oral understanding.

Ida E. Cobb came into the Cobb Canvas Company as a part-time employee in 1937 at a merely nominal salary; became a full-time employee in 1948; and as the business grew was advanced from $8 per week until, in 1945, she was receiving $35 per week. Her earlier duties had included bookkeeping, taking orders over the telephone, and handling the funds that came in and were paid out. As the business increased, Ida became familiar with canvas and was able to handle some of the business over the telephone, while the number of accounts increased to somewhere between three and five hundred. Cobb was its general manager, spent most of his time on the inside, while Carson was primarily the outside salesman. When in 1942 Cobb was away for over three months, Ida, who had then become his fiancee, took complete charge of the office. In March, 1945, Cobb and Ida were married. Immediately after the dissolution of the Cobb-Carson partnership, Cobb and his wife entered into the verbal agreement to continue the old business in the same style, and thereafter both signed checks upon the company's bank account. As individuals, and outside of their partnership relation, they held title to the real estate occupied by the company, and on September 20, 1947, they executed four notes payable to Carson and his wife, each in the sum of $500, as part payment for Carson's one-half interest in the property. In early December, 1945, accounts were set up showing the equal capital interests of the partners, partnership returns of income were made for the month of December, 1945, and for 1946, on the basis of an equal division of partnership income.

The net income of the Cobb Canvas Company for the period 1939 to 1945 had ranged from a little under $2,000 to somewhat over $18,000 for the calendar year 1944. In 1945, there was a sharp increase due to procurement by the company of a large supply of canvas from the United States Navy, which permitted it to supply a big demand for tents, awnings, and tarpaulins and increased their net revenue for the first eleven months of that year to over $36,000. At undetermined times before her marriage, Ida loaned to petitioner various sums, aggregating $1,200, and received notes for the loans. After her marriage, the notes were destroyed and the money was never repaid. Ida and the petitioner wrote checks for funds as needed with which they paid their personal household expenses and financed the Maple Knoll Farm, a horse training stable at Plymouth. There was no segregation of funds between the petitioner and his wife. In 1937, Ida began riding horses and, in 1941, and subsequent years took lessons to qualify her to show saddle horses in competition. She later became an outstanding horsewoman, earned many prizes, and as a result of contacts made by the petitioner and wife through their interest in riding horses they sold or rented canvas equipment to outdoor horse shows. The partnership income for 1944 from this source was approximately $700, and in 1945 approximately $1,400. The Tax Court found the ultimate fact that the petitioner and his wife did not in good faith, and acting with a business purpose, intend to join together in conduct of the business of the Cobb Canvas Company as partners. It therefore redetermined deficiencies in income tax for the years 1945 and 1946 on the assumption that the entire income was the income of Cobb.

The record leads to a more complete understanding of Ida's activities and the responsibilities assumed by her with respect to the Cobb Canvas Company. For years she had been employed at a salary recognized by Cobb, Carson, and herself as wholly inadequate. She stayed with the business, however, because she had faith in its future and because of the repeated promises of Cobb that she would receive an interest in it. Cobb testified "I always had it in mind and I wouldn't have bought Mr. Carson out if she hadn't come in." "She was

to run the office and take over as much as she could of the job that Mr. Carson had been operating as we couldn't afford a salesman at that time." In answer to the question as to why he entered into partnership relations with Mrs. Cobb in 1945, "Because I had to have her. I couldn't see where I could run that business without her * * *. She was absolutely vital to it. We needed her. I couldn't have run that business alone. I wouldn't have wanted it. I wouldn't have took it. I wouldn't have bought Carson out if she hadn't come with me." In answer to the query as to Ida's acquaintanceship with customers, "Every one of them. She growed up right with it. She knew every customer and every little bit of the types of angles. We operated that business for 16 hours a day for five years just to give trucking companies service."

In similar vein was Ida's testimony, "As the business picked up I acquired more accounts and the business was gradually growing and I became more familiar with canvas, was able to sell over the telephone and do business in general with our customers." "During the war, I was left in the office a good bit of the time alone and (referring to Cobb) sometimes he wouldn't get back to the office for two weeks at a time." She stayed in the business "because I believed in it. Mr. Cobb had talked of incorporating the business and he had told me if I stayed with them and we were able to build this business up to something, that I would eventually become, either for a share in the stock or a part owner of some standing." "Mr. Cobb had asked me if I would be willing to take over the responsibility of being a partner. He and Mr. Carson were to dissolve their partnership. * * * I knew it would mean more work for me and more responsibility." Likewise in the testimony of Carson, "Well, she did everything from keeping the books to running the business."

With respect to the training stable at Maple Knoll, both Cobb and Ida testified that they saw the possibilities of building up a large business in furnishing canvas to the horse shows that were being conducted throughout the State and elsewhere. They concluded the only way to acquire this business was to get upon the inside. They put in their money in equal amounts. The enterprise produced profit in both 1945 and 1946 and it was anticipated that it would build up into a very large business.

None of this evidence was refuted. The respondent produced no witnesses. The fact that the Cobbs had entered into an oral partnership agreement was accepted by the Tax Court as true. Their testimony was in no wise shaken by what we in Rookwood Pottery Co. v. Commissioner, 6 Cir., 45 F.2d 43, termed "destructive analysis." We have repeatedly held that in such situation it became the duty of the Commissioner to decide the issue in accordance with the proof and of the Court to take the same view. Rookwood Pottery Co. v. Commissioner, supra; Hughes v. Commissioner, 5 Cir., 153 F.2d 712; Voltz v. Treadway & Marlatt, 6 Cir., 59 F.2d 643.

Our reading of the Culbertson case, supra [337 U.S. 733, 69 S.Ct. 1213], as it interprets and clarifies Commissioner of Internal Revenue v. Tower, supra, convinces us that the over-all criteria of the existence of a partnership are the same under the revenue laws as under common law, and that a partnership is created "when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." The ultimate question is whether the partnership is real, and the contribution of capital or services are but elements in the determination of its reality. Whether "considering all the facts * * * the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent— the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." The want of substantial contribution to capital, nonparticipation in management and control, or the kind and character of con-

tributed services may place a heavy burden on the taxpayer to show bona fide intent, but such determination is not conclusive. "The Tower case did not purport to authorize the Tax Court to substitute its judgment for that of the parties; it simply furnished some guides to the determination of their true intent." Again, "existence of the family relationship does not create a status which itself determines tax questions, but is simply a warning that things may not be what they seem."

Whether the training stable was established for a business purpose is not to be determined by whether its profits during the first year or two were small or large. The expectation that it would contribute substantially to the business of the Canvas Company was a reasonable one, and in any event Culbertson does not teach that the business judgment of the Commissioner or the Court is to be substituted for that of the parties. They placed confidence in their judgment and supported it with their capital. The loans that were made to Cobb were important to Cobb when they were made, and became capital when the notes were destroyed.

Our conclusion is that the partnership claimed to have existed in 1945 and 1946 is demonstrated by the record to have had reality, that it was entered into in good faith for a business purpose, and that the inference drawn by the Tax Court that it was a mere sham for the purpose of evading taxes is clearly erroneous. This case must be aligned with our decisions in Lawton v. Commissioner, 6 Cir., 164 F.2d 380; Weizer v. Commissioner, 6 Cir., 165 F.2d 772; and Johnston v. Commissioner, 6 Cir., 180 F.2d 355. The taxes for 1945 and 1946 should be redetermined upon the basis of a partnership interest owned by both the petitioner and his wife in Cobb Canvas Company and the Maple Knoll Farm. We think, however, that in so doing the deductions of $1,200 for the maintenance of horses belonging to Cobb and his wife should be disallowed in respect to each of the tax years.

Reversed and remanded to the Tax Court for further proceedings in conformity herewith.